UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

TAMI L. OTT,

            Plaintiff,

        v.                                 Case No. 06-C-0371

AIRTRAN AIRWAYS, a wholly owned
subsidiary of AIRTRAN HOLDINGS, INC.,

            Defendant.

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT ON ALL CLAIMS (Doc. # 20), AND DISMISSING CASE

       Plaintiff, Tami Ott, was employed by defendant AirTran Airways between May 31, 2002, and August 9, 2005. She alleges that during her employment she was subjected to sex discrimination in the form of a hostile work environment, and unlawful retaliation. (*See* Compl. ¶¶ 44-49.) Ott brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Before the court is AirTran's motion for summary judgment on all claims. For the reasons set forth below, the motion will be granted.

SUMMARY JUDGMENT STANDARD

       Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

BACKGROUND[1]

---

[1] Five related cases, including this one, were brought by former AirTran employees against AirTran—*Dalton v. AirTran Airways*, Case No. 06-CV-348 (E.D. Wis); *Jensen v. AirTran Airways,* Case No. 06-CV-350 (E.D. Wis.); *Henneman v. AirTran Airways*, Case No. 06-CV-368 (E.D. Wis.); *Ott v. AirTran Airways*, Case No. 06-CV-371 (E.D. Wis.); *Cain v. AirTran Airways*, Case No. 06-CV-489 (E.D. Wis.). While these cases have not been consolidated, the defendants moved for summary judgment in all cases, and the parties consolidated briefing for all summary judgment motions. This resulted in nearly 1300 proposed findings of fact submitted by the parties (293 for the defendants, 1096 by the plaintiffs), along with more than one thousand pages of response materials and supporting documents. And, while the parties have submitted a very limited set of stipulated facts, most of their proposed findings of fact are disputed. Navigation of the record has therefore been a substantial and time-consuming endeavor.

With that in mind, the court has relied on the parties' set of stipulated facts, as well as each side's proposed findings of fact to the extent that they are undisputed, or that any alleged dispute is immaterial, unsupported, or otherwise not compliant with the local rules. Stipulated proposed findings of fact are designated as "SPFOF"; defendant's proposed findings of fact are identified as "DPFOF"; and plaintiff's proposed findings of fact are identified as "PPFOF."

Further, though AirTran has submitted evidence and proposed findings of fact disputing most of Ott's allegations, the background section is crafted assuming Ott's version of events for the purposes of summary judgment.

2

AirTran is a low-fare commercial airline that has operated out of Milwaukee since June 2002. It has corporate offices in Orlando, Florida and Atlanta, Georgia. The Milwaukee station operates with about twenty-five employees. This includes a station manager, which is the top spot, followed by two or three station supervisors. All other employees carry the title of customer service agent.

Tami Ott was a customer service agent for AirTran in Milwaukee between May 31, 2002, and August 9, 2005. Ott's fellow customer service agents included Laurie Dalton, Victoria Jensen, Susan Henneman, and Latrina Cain (who are all plaintiffs in related actions against AirTran).

Terese Sellers was the station manager for AirTran between March 6, 1999, and February 4, 2005. David Fox, who had served as a station supervisor between July 2002 and January 2006, became the station manager in January 2006. Tom Cross was a station supervisor for AirTran from May 31, 2002 to October 13, 2006. Thomas O'Neil has been employed by AirTran since May 31, 2002, and between June 16, 2003 and August 1, 2004, he carried the title of station supervisor. Amy Morris was employed by AirTran between June 2002 and August 2005 as its manager of employee relations and diversity. In this capacity, Morris oversaw AirTran's investigations into discrimination complaints and operated out of AirTran's office in Atlanta, Georgia.

Decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the station manager in Milwaukee or a human resources officer at AirTran's corporate headquarters. Station supervisors may assign personnel to various tasks and may issue Employee Discipline Reports and Attendance Review Forms reflecting absences or tardiness. For the most part, station supervisors perform their tasks alongside customer service agents.

3

Customer service agents perform various duties, including issuing tickets and boarding passes; checking baggage; assisting passengers boarding and exiting aircraft; loading and unloading bags at the ticket counter, gate, and aircraft; cleaning aircraft; security; marshaling aircraft; and otherwise providing service to customers. (DPFOF ¶ 12.[2]) These duties are performed in three principle areas: the passenger ticket counter; the flight gate; and the flight tarmac (also referred to as "ramp" duties). (DPFOF ¶ 23.) All customer service agents are trained to work in these three areas because staffing levels necessitate that each employee be prepared to work in any area during a given week, and shift from one area to another during a given day. (DPFOF ¶ 25.[3])

Some of the tasks associated with the customer service position involve heavy lifting and general physical labor. The job description for a customer service agent includes, among other things, the ability to work indoors and outdoors with strength and stamina to endure standing for an entire shift, as well as the ability to lift and move items up to seventy pounds repetitively, and climb, bend, kneel, crawl, and stoop on a frequent basis. (Fox Decl. ¶¶ 24-26, Def.'s Ex. 8.) This is particularly true on the ramp, though agents working at the counter or the gate often have to move or assist with luggage. (DPFOF ¶ 29.)

---

[2] Of note, many of the plaintiff's responses to the defendant's proposed findings of fact do not comply with Civil Local Rule 56.2(b)(1) (in effect prior to February 1, 2010). That Rule provides that materials in opposition to a summary judgment motion must include "A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Often, the court is left to wonder what aspects of a proposed finding of fact are actually disputed, why it is disputed, and what evidence calls the proposed fact into dispute. Without proper objections, such proposed findings may be deemed admitted for purposes of this summary judgment motion.

[3] The plaintiff "denies" this proposed fact, but (1) she does submit a proper objection pursuant to Civil L.R. 56.2(b)(1), and (2) the proposed findings of fact that she cites in support of her "denial" (or the evidence supporting the proposed facts) do not speak to this point. (*See* Pl.'s Resp. to DPFOF ¶ 25.)

4

In addition, at certain times, AirTran assigned personnel to the "operations center," where agents perform administrative tasks related to incoming and outgoing flights. AirTran also assigned personnel to "baggage services," where agents work in the baggage claim area and in AirTran's lost baggage office. (SPFOF ¶¶ 32-35.) Further, agents were assigned regularly to an area known as the "bag room," which is part of the "ramp" assignment.

AirTran maintained written employment policies in its Crew Member Handbook, which was updated periodically. (*See* Def.'s Ex. 1.) It included written policies regarding equal employment opportunities and sexual harassment. For the most part, all new AirTran employees receive a copy of the then-current Handbook during initial company training in Atlanta. Ott acknowledges receipt of the Handbook in 2005, and reviewing AirTran's sexual harassment policies before that time. (SPFOF ¶ 27). Updated versions of the Handbook are mailed to each station and distributed to the employees. (DPFOF ¶ 17.) In addition, electronic versions of the Handbook are available online through the company's intranet service, and the company's anti-harassment policy are posted throughout the employee break areas and behind the ticket counter. (*Id.* ¶¶ 18-19.) Moreover, Ott took part in training regarding sexual harassment during her initial training in Atlanta. (SPFOF ¶ 28.)

Despite AirTran's anti-harassment policy and training programs, Ott contends that several incidents during the course of her employment created a sexually hostile work environment. The primary offenders, according to Ott, are station supervisors Tom Cross and Thomas O'Neil.

On three to five occasions prior to December 2002, Ott observed briefly pictures of nude women on the computer terminals in the operations and ticket counter

5

areas.  (SPFOF ¶ 218; PPFOF ¶ 772.)  She only caught a glimpse of the images because "the guys" at the computer terminal would quickly shut off the computer if she walked by. (Pl.'s Ex. 4 at 108-10.)  Ott did not observe any such matters after December 2002. (SPFOF ¶ 219.)

With regard to Thomas O'Neil, Ott alleges that when she was working the ticket counter with her back to the baggage belt, O'Neil would rub up against her from behind as he walked past.  (SPFOF ¶ 229; Pl.'s Ex. 4 at 338, 342.)  According to Ott, this happened "all the time."  (Pl.'s Ex. 4 at 339.)  Occasionally, O'Neil would walk up behind her while she was working the ticket counter and press himself against her backside to see what she was doing.  (*Id.* at 342.)  Once when this happened, Ott responded "excuse me," to which O'Neil laughed and moved away.  (*Id.* at 342-43.)  While Ott mentioned O'Neil's conduct to another customer service agent, she did not complain about O'Neil to Sellers or to anyone in Air Tran's human resources office.   (SPFOF ¶ 230; Pl.'s Ex. 4 at 339-40.)

With regard to Cross, Ott charges that he made several inappropriate comments during the course of her employment.  In the summer of 2002, Ott overheard Cross comment to Sellers that she was the right height for him, which Ott believed to be a reference to oral sex.  (Pl.'s Ex. 4 at 90-91.)  Sellers laughed at such comments.  (*Id.* at 90.)  In August 2003, Cross commented to Ott that he wished he had been out with her on Water Street the night before so he could have "got in line to have his turn."  (SPFOF ¶ 220.)

In January 2004, while Ott was sitting in the operations area, Cross was joking nearby with a group of workers about "milkshakes," which was a reference to a sex act.  (Pl.'s Ex. 4 at 93-94.)  It somehow became known that Ott did not understand what

6

Cross was referring to by "milkshake," which caused several in the group to laugh. (*Id.* at 92, 94.) When Cross explained what he meant by "milkshake," Ott told Cross he was disgusting. (*Id.* at 125, 368.) Cross would continue to bring up "milkshakes" when he was trying to be funny in front of others, but Ott cannot remember specific times. (*Id.* at 368, 416.)

Once in January 2004, Ott observed Cross put his fingers in the air demonstrating a sexual act he likes to perform on women. (*Id.* at 92.) Also in January 2004, Ott observed a group of employees, including Cross, joking and discussing what Ott believed to be pictures of AirTran workers skinnydipping at a recent pool party. Ott did not see the pictures or attend the party. (SPFOF ¶ 221; Pl.'s Ex. 4 at 115-17.)

At some point, Ott overheard Cross talk about going to bars with his friends and bringing back women to his "pad" for sex. (*Id.* at 92.) When talking about this, Cross would move his pelvis. (*Id.* at 92.) In addition, Ott overheard Cross comment about the physical appearance of women passing by the AirTran ticket counter, including their breasts. (SPFOF ¶ 219; Pl.'s Ex. 4 at 371.)

Ott also overheard Cross say demeaning things about women. According to Ott, Cross would say things like "women are bitches and they deserved to be beat, and that they were below men and . . . when he gets married, he's going to make his wife stay barefooted and pregnant, and she has to say in the house . . . and that women aren't good." (Pl.'s Ex. 4 at 102.[4]) He would refer to women as bitches "continuously." (*Id.* at 105.) On various occasions, she overheard Cross refer to a female coworker as the

---

[4] In her proposed findings of fact, Ott states that she witnessed Cross make such comments "beginning sometime in December 2004 and throughout the balance of Ms. Ott's employment with the defendant." (PPFOF ¶ 768.) However, the deposition testimony she cites in support of this statement includes no reference to when Cross made such statements, and the letter she cites is not admissible evidence for this proposition.

7

"AirTran whore." (*Id.* at 369-70.) In addition, Ott overheard Cross say phrases such as "skeet on her" or "nut on her," referring to ejaculation, but Ott cannot remember any particular instances when he said this or to whom he said it. (*Id.* at 370, 420.) According to Ott, Cross never touched or otherwise had physical contact with her in a way that she felt was sexual or sexually inappropriate. (SPFOF ¶ 222.)

In February or March 2004, Sellers asked Ott if she had "any problems with things that were going on around AirTran." (SPFOF ¶ 223.) According to Ott, she told Sellers, among other things, that she "didn't like how [Cross] treated the women around there," but she did not give Sellers any examples of what she was referencing. Ott assumed that Sellers knew what she was talking about. (PPFOF ¶ 780; SPFOF ¶ 225.) According to Ott, this discussion of Cross lasted about one minute, and it was the only time she ever complained to AirTran's management about sexual harassment. (SPFOF ¶¶ 225-28.) Ott notes that this conversation "marks an end date to events contributing to the hostile work environment." (Pl.'s Br. 68 n.183.)

In July 2004, Ott informed Sellers that she was going to provide a statement to Laurie Dalton's attorney regarding Dalton's administrative charge of discrimination against AirTran. (PPFOF ¶ 790; Pl.'s Ex. 4 at 173-75.) On August 10, 2004, Ott filed an administrative charge of sex discrimination and retaliation against AirTran with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), and cross-filed with the Equal Employment Opportunity Commission (EEOC). (SPFOF ¶ 46.)

On June 18, 2005, Ott took a leave of absence due to a shoulder injury. (DPFOF ¶ 264.) She remained on company-approved leave between June 18, 2005, and August, 9, 2005, when she resigned her employment with AirTran. (SPFOF ¶¶ 231-32; DPFOF ¶ 265; PPFOF ¶ 860.) After she resigned, Ott filed a second charge of

8

discrimination with the ERD and EEOC on November 23, 2005, claiming that she had been retaliated against based on her opposition to discrimination in the workplace, her assistance with a discrimination complaint, and the filing of her initial administrative complaint. (SPFOF ¶ 47; Def.'s Ex. 14.[5])

## DISCUSSION

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), and discrimination against an employee for opposing a practice otherwise made unlawful under Title VII, 42 U.S.C. § 2000e-3(a). Discrimination under Title VII includes sexual harassment in the workplace, *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006), and retaliation against an employee because the employee has complained of illegal discrimination, *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

### A. Hostile Work Environment

As an initial matter, Ott asserts that she was subject to a hostile work environment based on sexual harassment. To succeed on this claim, a plaintiff must show that (1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex, (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability. *Kampmier*, 472 F.3d at 940. Here, AirTran does not challenge Henneman's claim regarding the first and second prongs of the prima facie case.

---

[5] The Defendant's Exhibit 14 is Ott's second administrative charge filed with the ERD on November 23, 2005. It lists the "date of the first violation" as August 5, 2004. In the portion designated for "statement of discrimination," it states "Please see enclosed." However, no further documentation is attached to Exhibit 14.

9

Instead, it contends that Ott cannot establish that (1) the alleged harassment was sufficiently severe or pervasive to create a hostile or abusive atmosphere, and (2) there is a basis for employer liability.

"In order to survive summary judgment on a hostile work environment claim, a plaintiff must present evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Robinson v. Sappington*, 351 F.3d 317, 329 (7th Cir. 2004) (quoting *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336 (7th Cir. 2001)).  To do so, she must show that it "was both objectively and subjectively offensive."   *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004).  "In other words, the environment must be 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004) (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002)).  As to objective hostility, "[c]ourts look to several factors . . . including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Kampmier*, 472 F.3d at 941 (citing *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 806-07 (7th Cir. 2000)); *see also Robinson*, 351 F.3d at 329 ("A hostile or offensive working environment is one that 'affected seriously the psychological well-being of the plaintiff.'" (citing *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)).

"[T]he line between actionable and nonactionable sexual harassment 'is not always easy' . . ."; it is not governed by a "mathematically precise test." *Robinson*, 351 F.3d at 329.  "The 'occasional vulgar banter, tinged with sexual innuendo of coarse or

10

boorish workers generally does not create a work environment that a reasonable person would find intolerable.'" *Id.* (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). However, when the offensive conduct is proved to be so severe, even isolated incidents may potentially create a hostile work environment for the employee. *See Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002.)

For its part, AirTran does not dispute that Ott and others testified to the comments and conduct allegedly contributing to a sexually hostile environment. On the other hand, AirTran submits that Ott's allegation that she observed pornography on company computers in December 2002 falls outside the applicable limitations period, and in any event, none of the incidents cited by Ott rise to the level of actionable harassment. AirTran further contends that court should consider the conduct of Cross and O'Neil separately.

With regard to the limitations period under Title VII, a plaintiff in Wisconsin must file an employment discrimination charge with the EEOC within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5 (e)(1). A hostile work environment qualifies as an unlawful employment practice, see *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007), and "[a] charge of discrimination based on a hostile work environment covers all events during that hostile environment, if the charge is filed within 300 days . . . of the last act said to constitute the discriminatory working condition." *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 768 (7th Cir. 2007); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 104-05 (2002).

Where a plaintiff can establish that "an act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile

11

environment may be considered by a court for the purposes of determining liability." *Morgan*, 536 U.S. at 117. The Supreme Court adopted this "continuing violation" approach because "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.*

Here, Ott filed her administrative charge with the ERD and EEOC on August 10, 2004. (SPFOF ¶ 44.) Under 42 U.S.C. § 2000e-5(e)(1), the 300-day window for her sexual harassment claim reaches back to October 13, 2003. Thus, Ott may rely on all of her claimed instances of harassment as long as at least one of the contributing incidents occurred on or after October 13, 2003.

Further, under *Morgan*, the court's charge is to look at all the circumstances. 536 U.S. at 116. "It is inappropriate to draw lines by time . . . or by the particular method that the men used to make working conditions worse for the women than for themselves," *Bright*, 510 F.3d at 769-70. "Title VII creates responsibilities for 'employers' as entities." *Id.* at 768; *see also Isaacs*, 485 F.3d at 386 (noting that the court should not focus on the identities of the alleged harassers—the defendant is the employer, the entity responsible for complying with Title VII). "If a plaintiff claims that [s]he is suffering a hostile work environment based on the conduct of coworkers and supervisors, then under the Supreme Court's totality of circumstances approach . . . all instances of harassment by all parties are relevant to proving that h[er] environment is sufficiently severe or pervasive." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000) (internal citations omitted). While the question of employer liability requires the court to separate conduct of a supervisor from conduct of coworkers, see *Parkins,* 163 F.3d at 1032, "[c]ourts should not

12

carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive," *Mason*, 233 F.3d at 1045.

With this backdrop, inasmuch as Ott maintains that certain incidents contributing to her claim were ongoing through at least January 2004 and perpetrated by the same individuals, all incidents of alleged harassment may be considered. *See Morgan*, 536 U.S. at 120 (affirming court of appeals finding the pre- and post-limitations period incidents may be considered as they involved the same types of actions, the same persons, and occurred relatively frequently). Ott's charges center on three matters: (1) brief glimpses of nude women on computers in the operations center and ticket counter area; (2) O'Neil rubbing himself against her backside when he walked behind her at the ticket counter; and (3) Cross's comments and gestures.

First, Ott's contention that she briefly saw images of naked women on computers screens is weak evidence in support of her hostile work environment claim.[6] Ott testified that this happened three to five times before December 2002, and that she caught only a glimpse of the images because the screens were immediately shut off when she would pass by. *See Coolidge v. Consolidated City of Indianapolis*, 505 F.3d 731 (7th Cir. 2007) (noting that an incident where employee briefly viewed pornography was "not particularly severe" under Title VII). The unpublished decision in *Coniglio v. City of Berwyn, Ill.,* No. 99-CV-4475, 2000 WL 967989, *7 (N.D. Ill. June 15, 2000), which Ott

---

[6] Ott also alleges that she "heard Cross invite male employees to view pornography on his computer." (Pl.'s Br. 66.) However, Ott testified that she never saw what Cross was looking at on his computer and could not recall any details about whether others were invited into his office. (Pl.'s Ex. 4 at 373, 422.) In any event, whether Cross may have viewed pornography on his computer outside of Ott's presence has little impact on the Ott's work environment. *See Yuknis v. First Student, Inc*., 481 F.3d 552, 555 (7th Cir. 2007) ("The relation between the manager's watching pornography on his own screen and the plaintiff's working environment was almost as attenuated as if she had learned that he watches pornography on his computer at home.").

relies on for support, is distinguishable inasmuch as the plaintiff in that case asserted, among other things, that the supervisor "engaged in viewing pornography in full view of employees on a regular basis." Ott does not suggest that her brief exposure to the naked images impacted her ability to perform her job, (*see* Pl.'s Br. 68-69; PPFOF ¶¶ 772-74 (addressing pornography)), she did not complain about what she viewed, and she did not mention a reoccurrence after December 2002.

Similarly, the comments attributed to Cross, while undoubtably offensive and degrading, cannot be said to contribute substantially to a hostile work environment under the circumstances. With the exception of Cross's comment that he wished he had been out with Ott the previous night so he could have "got in line to have his turn," none of the comments or gestures by Cross were directed at Ott. *See e.g., Yuknis v. First Student, Inc.*, 481 F.3d 552 (7th Cir. 2007) (distinguishing targeted harassment and "second-hand harassment" in the hostile work environment context); *Smith*, 388 F.3d at 567 ("While certainly relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the impact of such second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff." (internal quotations omitted)), *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (finding that multiple gender-based comments by alleged harasser, including a "statement to a female nurse that 'the only valuable thing to a woman is that she has breasts and a vagina,'" are insufficient to constitute severe or pervasive harassment); *Baskerville*, 50 F.3d at 430-31 (finding several sexually tinged comments directed at plaintiff over seven months insufficient to reasonably constitute sexual harassment).

14

Ott's reliance on *Quantock v. Shared Marketing Servs., Inc.*. 312 F.3d 899 (7th Cir. 2002) is misplaced given that the alleged harasser in that case was the president of the company and expressly propositioned the plaintiff, an assistant, for sex. 312 F.3d at 902. "First, he asked for oral sex. As soon as she refused, she testified, he asked her to participate in a 'threesome.' After another refusal, she claims he suggested that he call her on the telephone so that they could have 'phone sex.' She says she refused that request as well." *Id.* In addition, the harasser had previously "grabbed her breasts and forcibly kissed her," but those incidents occurred years before. *Id.*

The allegations that O'Neil engaged in uninvited physical contact with Ott are more serious. But, "the mere existence of physical contact does not create a hostile environment." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006). "Physical harassment lies along a continuum just as verbal harassment does" and courts should "focus intently on the specific circumstances of physical harassment." *Id.* Under the circumstances of this case, O'Neil's allegedly inappropriate conduct does not tip the scales in Ott's favor.

O'Neil is said to have rubbed his pelvis against Ott's backside on occasion when he passed behind her while she worked at the ticket counter. The contact was brief, never accompanied with sexual comments or other inappropriate conduct, and Ott never thought to report it as sexual harassment. While Ott looks for support in *Gentry v. Export Packaging Co.*, 238 F.3d 842 (7th Cir. 2001), that case is distinguishable inasmuch as the court of appeals highlighted several aggravating factors not present in this matter. In *Gentry*, the plaintiff asserted that the supervisor-harasser "subjected her to 40 hugs, 15 shoulder rubs, a kiss on her cheek, and two instances where [the supervisor-harasser]

15

petted her cheeks." 234 F.3d at 845. In addition to the frequent physical contact, the supervisor-harasser, who was nineteen years older than the teenage plaintiff, "invited [the plaintiff] implicitly to have sex with him, and he showed her arguably 'off color' pictures.'" *Id.* at 850-51. The plaintiff told the supervisor to stop his behavior, and the court concluded that under such circumstances, a reasonable jury could conclude that the plaintiff was subject to a hostile work environment. *Id.* at 851. In contrast, even assuming sexual overtones, Ott's allegations of physical contact fall more in line with those deemed insufficient by the Seventh Circuit. *See, e.g., McPherson v. City of Waukegan*, 379 F.3d 430, 434, 439 (7th Cir. 2004) (concluding that allegation of supervisor's pulling back the plaintiff's shirt to see her bra was insufficient); *Hilt-Dyson*, 282 F.3d at 459, 463-64 (finding that incidents of supervisor rubbing plaintiff's back were "brief and involved no threats, intimidation or humiliation," and, under the circumstances, "did not constitute actionable sexual harassment under Title VII"); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998) (finding "four isolated incidents in which a co-worker briefly touched her arm, fingers, or buttocks" insufficient under Title VII). *Cf. e.g., Patton*, 455 F.3d at 817 (finding allegation that harasser ran "his hand all the way up [the plaintiff's] inner thigh, under her shorts until he touched her underwear" actionable under the circumstances); *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001) (finding allegation that a supervisor touched the plaintiff's "breast near the nipple for several seconds" was sufficient to constitute a hostile work environment).

Hence, considering the totality of the circumstances, Ott has not put forward sufficient evidence upon which a jury could conclude that she was subject to a sexually

16

hostile work environment. Because Ott is unable to satisfy this aspect of the prima facie case, further discussion on employer liability is not necessary.

## B. Retaliation

Ott also maintains that AirTran unlawfully retaliated against her for complaining about sexual harassment and filing a charge of discrimination with the ERD. "Title VII forbids an employer from discriminating against an employee who has 'opposed any practice' made unlawful by Title VII." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009). "A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method." *Roby V. CWI, Inc.*, 579 F.3d 779, 786-87 (7th Cir. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006)).

"Under the direct method, a plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between them." *Scruggs*, 587 F.3d at 838. Alternatively, "a plaintiff proceeding under the indirect method establishes a prima facie case by establishing the same first two elements, as well as that: (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Id.* (citing *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) and *Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park,* 490 F.3d 558, 562 (7th Cir. 2007)).

"If the plaintiff succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action. *Id*. (citing *Stephens*, 569 F.3d at 787). "If the defendant does so, the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to

17

avoid the entry of summary judgment against it. *Id.* (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "'An employee's failure to cast doubt on an employer's nonretaliatory explanation' means a claim fails under either the direct or indirect method." *Id.* (quoting *Argyropoulos*, 539 F.3d at 736 n.6).

Here, Ott alleges that she engaged in three instances of protected activity: (1) in February 2004, after Sellers asked if she had "any problems with things that were going on around AirTran," she commented about Cross's conduct; (2) in July 2004 when Ott informed Sellers that she was going to give a statement to Dalton's attorney regarding Dalton's administrative charge of discrimination against AirTran; and (3) on August 10, 2004, when Ott filed her charge of discrimination against AirTran with the ERD. Ott goes on to assert that she suffered adverse employment actions, and thereby retaliation, in the form of (1) additional discipline, and (2) ostracism by her coworkers and managers.[7]

In response, AirTran maintains that Ott cannot establish that she suffered any adverse employment action or that there is a sufficient causal connection between Ott's protected activity and any employment action. For retaliation, an adverse employment action "must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Roney v. Ill. Dep't of Transp.,* 474 F.3d 455, 461 (7th Cir. 2007) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

First Ott contends that AirTran retaliated against her starting in August 2004 by issuing discipline notices for absences and policy violations. The record indicates that

-----------------------------

[7] Ott alludes to other possible forms of retaliation in her complaint, but in response to AirTran's motion for summary judgment, she limits her allegations of retaliation to these points. (*See* Pl.'s Br. 72-73 (discussing "adverse employment actions").)

18

she received Employee Discipline Reports (EDRs) on August 9, 2004, August 25, 2004, April 10, 2005, June 11, 2005, June 18, 2005. (SPFOF ¶¶ 199-200, 202, 204; Def.'s Ex. 126.) She was also issued Attendance Review Forms (ARFs) on April 25, 2005, and May 29, 2005. (Def.'s Ex. 127; SPFOF ¶¶ 201.) With the exception of the April 10, 2005, EDR,[8] Ott does not dispute that the EDRs and ARFs accurately reflect her conduct. She indicates that prior to informing Sellers in July 2004 that she was giving a statement to Dalton's attorney, she had never been disciplined for an absence despite being absent on several occasions. (Pl.'s Br. 72.)

As noted by AirTran, inasmuch as Ott seeks to rely on her July 2004 comment to Sellers that she was providing a statement to Dalton's attorney, the only actionable EDRs must have been issued within the applicable limitations period. Pursuant to 42 U.S.C. § 2000e-5(e)(1), a charge of employment discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice. And because Ott's second administrative charge, which addressed retaliation based on assistance to Dalton (SPFOF ¶ 47), was filed on November 23, 2005, any discrete acts that occurred more than 300 days prior to this date, or before January 29, 2005, cannot contribute to her Title VII retaliation claim. *See Roney*, 474 F.3d at 459-60.

Ott maintains that retaliation through issuance of ERDs began in August 2004 when she received her first EDR. Hence, this claim of retaliation is untimely. *See id. at* 460 ("[T]he record indicated Roney knew about the retaliatory act of which he now

---

[8] The April 10, 2005, EDR indicates that Ott was not at her assigned position and did not properly clean an aircraft. (Def.'s Ex. 126.) Though the box marked "I agree with the description given" is checked, Ott testified that she did not in fact check that box. (Pl.'s Ex. 4 at 72-73.) The EDR does, however, include Ott's written explanation of why she was not at her post and states that she accepts responsibility for taking too long of a break. She disagreed that she failed to properly clean the plane. (Def.'s Ex. 126; Pl.'s Ex. 4 at 72-75.)

19

complains shortly after it occurred . . . however, Roney waited over 300 days to file a charge with the EEOC.").

Moreover, it is difficult to see how the issuance of EDRs qualifies as an adverse employment action under the circumstances. *See Longstreet v. Ill. Dep't of Corrections*, 276 F.3d 379, 384 (7th Cir. 2002) (noting that the plaintiff's complaints "of negative performance evaluations and being required to substantiate that her absences from work were illness-related . . . are not adverse employment actions actionable under Title VII"); *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (noting that "unfavorable performance evaluations alone did not constitute adverse employment actions"). Ott concedes that she was never suspended from work, docked pay, or suspended from shift trades due to attendance issues. (SPFOF ¶ 205.). And, she acknowledges that for the most part the EDRs (issued before and after January 29, 2005) accurately reflect her conduct on the date issued.

Moving on, Ott contends that right after she filed her administrative charge in August 2004, her coworkers and managers "started shunning" her. (Pl.'s Ex. 4 at 184, 192; Pl.'s Br. 72.) While some of her coworkers would continue to engage her in conversation, Ott testified that many would talk around her or ignore her. Sellers admitted that around this time, she "did not have the cordial conversations with [Ott] that I had had in the past." She stated that she believed she had to be "a little cautious." (Pl.'s Ex. 7 at 134-35.)

However, while it is undoubted that Ott was hurt by her colleagues behavior, her claim of shunning by coworkers and managers is insufficient to show an adverse

employment action under the circumstances.[9] "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68 (citing 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 669 (3d. 1996). This includes "snubbing" by supervisors and coworkers. *See id.*; *see also Rait v. Oshkosh Architectural Door Co.*, No. 05-CV-1271, 2007 WL 702806, *8 (E.D. Wis. Mar. 2, 2007) (citing *Burlington Northern* and concluding that "the mere fact that an employee received the 'cold shoulder' after lodging a discrimination complaint does not, by itself, render such behavior actionable under Title VII"). Without more, a reasonable jury could not find retaliation against Ott in violation of Title VII. Now, therefore,

IT IS ORDERED that the defendant's motion for summary judgment on all claims (Doc. # 20) is granted.

IT IS FURTHER ORDERED that this case be dismissed.

Dated at Milwaukee, Wisconsin, this 31st day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

---

[9] While not raised by the parties, this allegation of retaliation appears untimely given the timing of Ott's second administrative charge, which addressed retaliation based on the filing of an administrative complaint. (SPFOF ¶ 47.) Ott submits that she started receiving the a cold shoulder by her coworkers and managers starting in August 2004. However, as discussed above, discrete acts of retaliation must have occurred within 300 days of the filing of the administrative charge to be actionable—after January 29, 2005. *See Roney*, 546 F.3d at 859.

21